JACOB ANDERSON, APPELLANT, *v.* DALY MINING COMPANY, RESPONDENT.

TORT — EVIDENCE — CUSTOM — EXPERT WITNESS — INSTRUCTION TO JURY — FELLOW SERVANT — LIABILITY OF MASTER — RISK OF EMPLOYÉ.

1. Plaintiff worked in defendant's mine, which employed three shifts of men, and from each shift a pusher was selected to direct the work, receiving 50 cents per day more than his fel-

low workmen. Blasting was done in the bottom of the shaft, and the reports counted after each blast to see if there were any missed holes. The pushers reported to their successors the number of missed holes, but, if the outgoing pusher failed to report, the oncoming pusher made inquiry, and this was a rule adopted by the pushers for their security. The pushers had charge of the men in the shifts, and instructed them, but had no authority to hire or discharge a man on the shift. Over the shifts was a foreman of the mine, who was never notified about missed holes. The shift preceding plaintiff's went off work leaving some of the holes unexploded, in which there was a small amount of powder, and the explosion of which caused the injury to plaintiff. The shift preceding plaintiff's was ordered off by the foreman, concerning whose orders there was a conflict in the evidence, to which certain exceptions were taken. It was competent for a witness who heard the testimony of a fellow witness, to testify that the orders said by the latter to have been given by the foreman were not correctly stated, and it was further competent for the former to testify to what did transpire.

2. It was proper for the foreman to testify as to who attended to reporting the missed holes, in order to show as a question of fact what the assigned, assumed, or customary duty of these shifts was.

3. It was not error for defendant to show what the general custom was among the miners of the camp who used the same drill and powder that plaintiff used when he received the injury complained of, and it might further show what the duty of a pusher was in caring for the safety of his men, in the absence of any contract. A usage or custom cannot be given in evidence to relieve a party from his express agreement, or to change a contract certain in its terms, yet it may aid in interpreting the intentions of the parties to a contract, the real character of which is to be ascertained, not alone from express stipulations, but also from general implications and presumptions arising from the nature and character of the employment.

4. The objectionable part of an instruction to a jury, when taken by itself, may be rendered unobjectionable by what follows, so that the whole charge may be considered in order to determine whether a party has been injured by the instruction.

5. The shift bosses were, as to one another, fellow servants, and defendant was not liable for their carelessness, unless the carelessness was brought to the attention of the defendant, who negligently failed to communicate the danger to the plaintiff.

Where the nature of the employment is extremely dangerous, and the conditions continually change by reason of placing and setting off blasts, whereby dangerous conditions arise continually through the acts of a servant, without the knowledge of a master, the employer cannot be held responsible without his fault, and the risks of such dangerous employment are those which the employé assumes in accepting the labor.

7. The duty of furnishing a safe place and appliances with which to do the work, and keeping them safe, so far as the employer is able to do by the use of ordinary care and prudence, cannot be delegated to an agent or servant of any degree, so as to escape responsibility by the master. In such a case the servant may become a vice principal. But the rule does not apply to a condition of danger brought about by the negligent acts of a servant or fellow servant, for whose acts he is responsible, nor to the hazards and dangers arising from the employment, and belonging to the peculiar occupation in which the servant is engaged, and which he assumed when he entered the master's service.

8. When the master furnishes a safe place and safe appliances, considering the work to be performed, and the servant, by his negligence, renders the place unsafe, without the master's fault or knowledge, the servant does not, in such a case, become the vice principal, and his knowledge is not the knowledge of the principal so as to render him liable.

(No. 843.   Decided Oct. 9, 1897.)

Appeal from the Third district court, Summit county. Ogden Hiles, *Judge*.

Action of tort by Jacob Anderson against the Daly Mining Company for injuries sustained by plaintiff while at work in defendant's mine. From a judgment for defendant plaintiff appeals.  *Affirmed.*

*Moyle, Zane & Costigan,* for appellant:

The shift bosses on these separate shifts and the mên on all the shifts were not fellow workmen as defined by the courts of Utah. The lower court took the extreme definition of common employment, a definition which this court has repeatedly refused to adopt. *Pool* v. *S. P. Co.,* 7 Utah 303; *Webb* v. *Railway Co.,* 7 Utah 363; *Trihay* v. *Mining Co.,* 4 Utah 468.

The court ignored in the charge the well settled rule that the shift boss was performing a duty of the master, for whose non-performance the master was liable. *McMahon* v. *Mining Co.,* 70 N. W. Rep. 478; Bishop Non-Cont. Law, sec. 656, 664; 2 Jaggard Torts, 1043–1045.

*Bennett, Harkness, Howat & Bradley* and *H. J. Dinenny,* for respondent.

When the place furnished by the master is safe when furnished, but is made unsafe by the work that is being done in it, the master has no duty in regard to it. It is the duty of the men to keep it safe. *Swanson* v. *Ry.,* N. W. Rep. 978; *Consolidated Coal & M. Co.* v. *Ford* (Ohio), 25 L. Rep. Ano. 848–56; *Cullin* v. *Bull,* 45 Pac. Rep. 1017–20; *Petaja* v. *Aurora,* 66 N. W. Rep. 951–2; *Finlayson* v. *Utica,* 67 Fed. 507; *Davis* v. *S. P. R. R.,* 98 Cal. 19–25; *Burns* v. *Sennett,* 99 Cal. 363–8; *Lewis Con. Coal Co.* v. *Scheller,* 42 Ill. App. 619; *Kelley* v. *Norcross,* 121 Mass. 508; *McGinty* v. *Reservoir,* 155 Mass. 183–7; *City of Minn.* v. *Lundin,* 58 Fed. Rep. 525–29; *Mansco* v. *Cataract Co.,* 34 N. Y. Supp. 507; *Gulf C. & S. F. Ry. Co.* v. *Jackson,* 65 Fed. Rep. 48; *Con. C. & M. Co.* v. *Clay* (Ohio), 38 N. E. Rep. 610; *Marsh* v. *Herman* (Minn.), 50 N. W. Rep. 611; *Corson* v. *Coal Co.* (Iowa), 1 Am. Neg. Rep. 230; *Ling* v. *Ry.* (Minn.), 52 N. W. 378; *Peschil* v. *Ry.* (Wis.), 21 N. W. Rep. 269; *Beasley* v. *Wheeler* (Mich.), 61 N. W. Rep. 658; *Bullen* v. *Townsend*

(N. Y.), 26 N. E. Rep. 1017; *Cullen* v. *Norten*, 26 N. E. Rep. 905; *Cleveland* v. *Brown*, 73 Fed. Rep. 974.

When men are engaged in doing the master's duty they are fellow servants in doing that ·duty. *Murphy* v. *Ry.*, 88 N. Y. Rep. 146; *Cleveland* v. *Brown*, 73 Fed. Rep. 974; *Marsh* v. *Herman*, 50 N. W. Rep. 611; *Lindell* v. *Woods*, 42 N. W. Rep. 1020; *Frazer* v. *Lumber Co.*, 47 N. W. Rep. 785; *Skinner* v. *Ry.*, 15 S. W. Rep. 442.

Miner, J.:

This appeal was taken by the plaintiff June 14, 1897, from a judgment entered in the Third district court of Summit county, in favor of the defendant. The verdict of the jury was rendered June 18, 1896. The action was brought to recover damages for injuries alleged to have been received by the plaintiff while working in defendant's mine, through the negligence of the defendant. There is testimony tending to show that defendant was sinking a shaft in its mine by the use of Burleigh drills worked with compressed air. About 27 holes had been drilled in the bottom of the shaft. This work was being done by three shifts of six men each. Each shift was in charge of a pusher, who formed one of the shifts, and worked the same as the other men, but who received 50 cents a day more. James Quinn was foreman of the mine, and had control of the pushers. The pusher had charge of the men on the shift, and instructed them, but had no authority to hire or discharge any man on the shift. A "missed hole" is one where the powder in the hole has not exploded, and is usually dangerous. A "pot hole" is one where there has been an explosion, but one where the rock is not driven out, and the bottom is left like a pot. Winn was pusher in the first shift, which went on at 7 a. m. and off at 3 p. m. Anderson, the plaintiff, was

pusher in the second shift, that went on at 3 p. m. and off
at 11 p. m. Malia was pusher in the third shift, and went
on at 11 p. m. and off at 7 a. m. All did the same kind
of work at times in drilling, blasting, and cleaning out
the same shaft. The holes being drilled were five or six
feet deep, and filled with giant powder, and exploded by
caps. When holes were exploded, the pusher and others
counted the number of explosions, to see if they corre-
sponded with the number of holes or blasts set off, in
order to determine the number of missed holes; but this
method was not always accurate, as sometimes several
holes would explode at once, and missing reports would
not always indicate missing holes. There was an ar-
rangement among the shifts that offgoing pushers should
notify oncoming pushers of any missing reports. The
pushers made it a rule to tell each other. If the pusher
going off failed to make a report, it was the custom of the
oncoming pusher to ask him if there were any missing
holes. The oncoming pusher would not be justified in not
asking the question as to missing reports. This was a
rule among the miners for their own safety, with which
defendant had nothing to do, and the foreman of the
mine was never notified. The plaintiff had worked in the
mine for four years, and in this shaft for a considerable
time, and was a pusher working on one of the shifts. On
June 25, 1895, Malia, a pusher, went off work with his
shift at 7 a. m. Winn, a pusher, with his shift, went on
at the same time. Malia reported to Winn that in the
center shaft there were five missing holes. Winn cleared
the dirt off the end holes, and blasted them, and left nine
reports short. At 3 p. m. plaintiff, with his shift, went
on. Winn did not notify plaintiff of the missing reports,
nor did the plaintiff ask him if there were any. Plaintiff
attended to some timbering, but did no blasting, and

16 UTAH—3

went off at 11 p. m. Malia's shift came on at 11 p. m.,
cleared off some dirt, but did no blasting, and went off
at 7 a. m., June 26th. Winn, who had received a report
from Malia of the missing holes, with his shift, came on
at 7 a. m., June 26th. Carr—a witness—testified that
Winn cleared up, looked for, and found a missed hole
in the center of the shaft, two blown-out holes on the
side, and two or three in the east end. Winn put a
scraper in the hole, and said he would blast the holes,
when the foreman came down, and sent him to work on
another level, saying that other parties would do the
blasting. The testimony of Carr concerning the missed
holes, and the placing of a scraper in one of them, and
as to what the foreman said, is disputed by other witness-
es, who claim there were no holes in the shaft except pot
holes, and that the foreman was not present, and did not
make the statement attributed to him, but, on the con-
trary, saw Winn on the top of the shaft, and was there
informed there were no missing holes. As to what did
transpire before and at the time of the accident is in dis-
pute, and the testimony is conflicting. It sufficiently ap-
pears, however, that plaintiff, Anderson, with his shift,
commenced drilling in the center of the shaft, and was in-
jured by an explosion from one of the holes previously
drilled that had not exploded, and which contained a
small amount of powder. Mr. Quinn was called by the
defendant, and stated that he heard the testimony of Carr
with reference to witness having directed Winn to take
his men up to the tenth level at the time of the accident,
and was asked, " How is that as to being true or not?"
The question was objected to as irrelevant, incompetent,
and immaterial, and as calling for a conclusion. The ob-
jection was overruled, and witness answered " No, sir,"
and then stated the facts. Under these circumstances

we discover no error in the ruling of the court. The wit-
ness stated the facts in detail concerning the matter, and
the plaintiff was not in any way prejudiced by the man-
ner in which the facts were obtained. Mr. Carr, a wit-
ness for the plaintiff, gave testimony tending to show
that Quinn, the superintendent, had directed Winn, just
before the accident, while in the bottom of the shaft, to go
out on the 1,000-foot level, and do work there, and that
the next shift would blast the missed holes in question.
It does not appear that plaintiff was present at this con-
versation. Mr. Quinn had denied this conversation, and
stated that he was not at the bottom of the shaft at the
time, but on top of the shaft, and there had a conversa-
tion with Winn. Mr. Quinn was then asked what was
said. The question was objected to. The objection was
overruled on the ground that it was proper to show
under what circumstances he ordered the men away from
the pot holes, to show the facts. Witness replied that he
asked Winn where he was going, and was informed that
he was going to blast a couple of pot holes in the bottom
of the shaft, and that there were no missed holes there,
etc. This subject was opened up by the plaintiff. This
testimony was proper as tending to show the place of
the conversation, and to show what the facts were that
caused him to order Winn from going to the bottom of the
shaft to take care of water running into the shaft, and as
bearing upon Quinn's alleged negligence at the time.
Counsel for the defendant asked the same witness the
following question: "Whose duty was it, when these
shifts went on, to see that the work was properly and
carefully done, so as to avoid injury to the men or to the
pushers themselves,—who attended to that?" The ques-
tion was objected to, and the objection overruled. An-
swer: "The pushers. The pushers ought to look around,

and instruct the men." The question was imperfectly framed, but was not clearly improper. The plaintiff claimed that the injury was caused by Winn in not reporting missing reports. The defendant claimed the rule to be that the pusher and the men should examine the bottom of the shaft before commencing to drill, whether reported or not, and that the pusher coming on should inquire for missed holes. What the assigned, assumed, or customary duty of these shifts was, was a question of fact, and could properly be shown as such. We are unable to discover any reversible error in the ruling of the court in permitting the defendant to show, under the objection that it was incompetent, what the general custom was among the miners in the Park City camp, who used Burleigh drills and giant powder,—for the pushers to examine the shaft where holes were being drilled, and see that no powder was there, and look after the safety of the men. The plaintiff had been employed in that camp for about eight years, and would probably know of the custom if it existed. No express contract was shown. While a usage or custom cannot be given in evidence to relieve a party from his express agreement, or to change a contract certain in its terms, yet it has its legitimate place in aiding to interpret the intention of the parties to a contract, the real character and purpose of which is to be ascertained, not alone from express stipulations, but also from general implications and presumptions arising from the nature and character of the employment. *Burns* v. *Sennett,* 99 Cal. 363.

The plaintiff introduced testimony tending to show that the injury was occasioned by an explosion of about 2 or 3 inches of dynamite or giant powder $1\frac{1}{2}$ inches in diameter. The defendant sought to show that the effect of such an explosion upon a person standing near it

would be much more serious than that which resulted from this explosion to the plaintiff, in order to contradict the plaintiff, and that the injury was occasioned by the explosion of a cap. A witness was asked his opinion as to the result of an explosion of 2 or 3 inches of giant powder $1\frac{1}{2}$ inches in diameter, in use there, upon the face of a person, or upon the body, standing within $2\frac{1}{2}$ or 3 feet of the explosion. The question was objected to on the ground that the witness was not an expert; that the question was not founded upon the testimony, and was irrelevant, immaterial, and incompetent. The objection was overruled, and an exception taken. The witness answered that the chances were it would kill—blow his head off—or greatly injure the person. The foundation for the question had been previously laid. The witness was shown to be an expert in the use of dynamite as an explosive, and had heard the testimony on the subject of inquiry. We are of the opinion that the question was proper under the issue framed by the testimony in the case.

The court instructed the jury, among other things, that: " The burden of the proof is on the plaintiff to prove to your satisfaction by a preponderance of the evidence: (1) That the defendant did not provide a reasonably safe place for the plaintiff to work. (2) If you find that defendant did not provide a safe place for plaintiff to work, that the plaintiff did not know the place was unsafe, and could not have known it by the exercise of reasonable care for his own safety. (3) That plaintiff was injured by reason of the unsafe condition of the place where he was put to work, without any fault on his part, and when he was taking due care for his own safety. And in this connection I charge you further that, while the employer is bound to furnish a safe place for the servant

to work in, he is not bound to make it an absolutely safe place; but in a place where the nature of the business is such that the conditions are continually changing by reason of the putting in and setting off of blasts, and of continuing excavations in a shaft, and thereby temporarily dangerous conditions arise, the employer cannot be held responsible therefor, for such temporary dangerous conditions are among the natural and ordinary risks and hazards of the employment, for which the defendant, in case the servant is injured thereby, is not liable. If negligence on the part of the defendant, and injury resulting therefrom to the plaintiff, has been shown, and nothing further appearing, the presumption is that the plaintiff exercised proper care, and the burden is upon the defendant to establish contributory negligence on the part of the plaintiff. Before you can find plaintiff guilty of contributory negligence, you must be satisfied upon the preponderance of the evidence that he failed to observe that degree of care and caution that an ordinary miner would have observed under the circumstances which surrounded him at the time. The forepart of the instructions is quite indefinite, and, taken by itself, is open to the criticism that too much burden was thrown upon the plaintiff. But when the charge is read and considered together as a whole, as it should be, one part having direct relation to the other, it will readily be seen that this construction cannot reasonably be placed upon it. In connection with this first instruction, and as if calculated to explain it, the further instruction was given " that, if negligence on the part of the defendant and injury is shown, the presumption is that the plaintiff was exercising due care, and the burden is on the defendant to establish contributory negligence on the part of the plaintiff." This idea is further emphasized when the court said: " Before you

can find the plaintiff guilty of contributory negligence, you must be satisfied by a preponderance of the evidence that he failed to observe that degree of care and caution that an ordinary miner would exercise and observe under the circumstances."

The appellant further complains that the court, in its instructions to the jury, disregarded the view of the case as requested by the plaintiff; that Winn, in reporting and giving information, was performing one of the master's non-assignable duties, and therefore, as to the oncoming pusher and his shift, was not a fellow servant to the plaintiff. Upon this subject the court instructed the jury as follows: " You are further charged that the defendant is not liable to the plaintiff for injuries which may have been inflicted upon him by the negligence of fellow servants engaged with him in a common employment. And in this case I charge you, as a matter of law, that Michael Malia and Michael Winn, the shift bosses, or pushers, so called, and the other persons who were engaged with plaintiff in the work of blasting and excavating and the other work at the bottom of said shaft, on the three shifts, were fellow servants of plaintiff, engaged with him in a common employment, and, if the injuries which he received were caused by the carelessness or negligence of such fellow servants, or any of them, the plaintiff is not entitled to recover. And, further, the court charges you that an employer owes to his servant the duty of furnishing him a safe and proper place in which to prosecute his work, and of keeping the same safe, so far as the employer is able to do by the exercise of ordinary care and diligence. It is a duty that cannot be delegated to an agent or servant of any grade so as to excuse himself, or so as to escape responsibility to another who has been injured by its non-performance; and

that, if the leaving of the unexploded blasts was the result of the negligence of the plaintiff, or the persons working with him, or his fellow servants, plaintiff could not recover;" that if Quinn, the foreman of the mine, knew of the unexploded blasts, and directed Winn to go elsewhere without exploding them, or without notifying the other pushers, and plaintiff was injured thereby, plaintiff should recover; that notice to Quinn was notice to the company, etc. The three shifts in this shaft, of whom Winn, Malia, and the plaintiff were the shift bosses, were engaged in the same common employment, under one master. Neither of the shift bosses had any authority to hire or discharge men, but were simply laborers in one shaft, in one line of employment, under a common master. The plaintiff was an experienced laborer in that mine and shaft, and had been employed there for years. The testimony shows that it was customary among the men for the offgoing shift to notify the oncoming shift of unexploded holes, and, if this was not done, it was customary for the oncoming shift to inquire and ascertain whether any such unexploded holes were left, and that no such inquiry was made. We are of the opinion that these shift bosses and men were, in every view of the case, fellow servants. The instruction of the court on this subject was correct. *Railroad Co.* v. *Pool*, 106 U. S. 438.

The question as to whether Quinn, the foreman, did take Winn and his men away from their work in the bottom of the shaft, and as to whether or not Quinn's attention was at the time called to the dangerous condition of the unexploded holes, and whether he put the men to work elsewhere, without first placing the shaft in a safe condition, was a question in dispute in the case; but it was fully and fairly submitted to the jury by the court,

and the jury found the issues against the plaintiff thereon.

In entering the employment of the defendant the plaintiff assumed the ordinary risks incident to the employment engaged in. These risks were such usual hazards, dangers, and perils as belonged to the peculiar occupation of blasting rock with dynamite, including the carelessness of those engaged with him in the same work and employment. The employer was bound to furnish a reasonably safe place and appliances with which to do the work. But where the nature of the business is extremely dangerous, and conditions are necessarily continually changing by reason of placing and setting off blasts, whereby dangerous conditions arise continually through the acts of the servant, without the knowledge of the master, the employer cannot be held responsible therefor without his fault, but such temporary dangerous conditions arise from the nature of the employment, and are among the natural and ordinary risks and hazards attending the employment, for which the defendant is not liable. The duty of furnishing a safe place and safe appliances with which to do the work, and keeping the same safe, so far as the employer is able to do, by the use of ordinary care and prudence, cannot be delegated to an agent or servant of any degree, so as to escape responsibility by the master. In such a case the servant may become a vice principal. But this rule cannot apply to a condition of danger brought about by the negligence acts of a servant or a fellow servant, for whose acts he is responsible, nor to the hazards and dangers arising from the employment, and belonging to the peculiar occupation in which the servant is engaged, and which he assumed when he entered the master's service. So far as appears, the master furnished a reasonably safe place to

work and safe appliances to work with, considering the nature of the work to be performed; and the servant, by his negligence and want of reasonable care, rendered the place unsafe, without the master's fault or knowledge. Under such conditions the servant does not become the vice principal, and his knowledge is not the knowledge of the principal, so as to render the principal liable. The court correctly instructed the jury upon this subject. The several instructions given fully and fairly covered the law of the case, and were as favorable to the appellant as the facts would justify. The question as to whether the evidence was sufficient to justify the verdict is not presented in the record. The jury, under fair instructions from the court, found the issues in favor of the defendant. We find no reversible error in the record. The judgment of the court below is affirmed.

BARTCH, J., and CHERRY, District Judge, concur.